---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

**UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO**

*Plaintiff-Appellee,*

v.

**DAVID EFRON**

*Defendant-Appellant.*

---

Appeal from the United States District Court for
the Southern District of Florida

Case No:  1:22-cv-23924-DPG

---

## INITIAL BRIEF FOR DEFENDANT-APPELLANT

---

Leslie B. Rothenberg, Esq.
THE FERRARO LAW FIRM
600 Brickell Avenue, 38th Floor
Miami Florida 33131
FBN: 607850
lrothenberg@ferrarolaw.com
mgutierrez@ferrarolaw.com
sscott@ferrarolaw.com
*Attorney for Defendant-Appellant*

# CERTIFICATE OF INTERESTED PERSONS AND
# CORPORATE DISCLOSURE STATEMENT

Appellant, David Efron, pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, hereby certifies that the following is a complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, publicly held corporations that own 10% or more of a party's stock, and other identifiable legal entities related to a party:

1.  Bayer, Theodore R. – Arbitration Panelist

2.  Bressler, Amery & Ross, P.C. – Counsel for Petitioner/Appellee

3.  Delgado & Fernandez, LLC – Arbitration Counsel for Respondent-Appellant

4.  Echarte, The Honorable Pedro P., Jr. – Florida Circuit Court Judge

5.  Efron, David – Respondent/Appellant

6.  Fernandez-Martinez, Alfredo – Arbitration Counsel for Respondent/Appellant

7.  Fishman, Michael R. – Arbitration Counsel for Petitioner/Appellee

8.  Gayles, The Honorable Darrin P. – U.S. District Court Judge

9.  Graham, Benjamin W. – Counsel for Petitioner/Appellee

10. Gutierrez, Mathew D. – Counsel for Respondent/Appellant

11. Hernandez-Freire, Pedro – Arbitration Counsel for Respondent/Appellant

12. Lasher, Lisa D. – Senior Case Coordinator, FINRA Dispute Resolution

13. Maniglia, Kalie Marie – Counsel for Petitioner-Appellee

14. Manning, Christopher N. – Counsel for Petitioner/Appellee

15. Murphy, Will – Arbitration Panelist, Chairperson

16. Reid, The Honorable Lisette Marie – U.S. Magistrate Judge

17. Rothenberg, Leslie B. – Counsel for Respondent/Appellant

18. Sabo, Alex J. – Counsel for Petitioner/Respondent

19. Saharia, Amy M. – Counsel for Petitioner/Respondent

20. Santoro, Thomas Mead – Arbitration Panelist

21. The Ferraro Law Firm, P.A. – Counsel for Respondent/Appellant

22. UBS AG – Non-Party Indirect Parent Company of Petitioner-Appellee UBS Financial Services Inc.

23. UBS Americas Holding LLC – Non-Party Parent Company of Petitioner-Appellee UBS Financial Services Inc.

24. UBS Americas Inc. – Non-Party Parent Company of Petitioner/Appellee

    UBS Financial Services Inc.

25. UBS Financial Services, Inc. – Petitioner/Appellee

26. UBS Group AG –Non-Party, Publicly Traded (stock ticker: UBS) Indirect Parent Company of Petitioner/Appellee UBS Financial Services Inc.

27. Williams, The Honorable Kathleen M. – U.S. District Court Judge (Recused)

28. Williams & Connolly LLP – Counsel for Petitioner/Appellee

Counsel for Appellee/Plaintiff, UBS Financial Services Incorporated of Puerto Rico, which based on merger is now UBS Financial Services Inc., has also certified that UBS Financial Services Inc. is a 100% owned subsidiary of UBS Americas Inc., which is a corporation formed under the laws of Delaware; that UBS Americas Inc. is a 100% owned subsidiary of UBS Americas Holding LLC, formed under the laws of Delaware; that UBS Americas Holding LLC is a 100% owned subsidiary of UBS AG, which is a limited company formed under the laws of Switzerland; and that UBS AG is a 100% owned subsidiary of UBS Group AG, which is a publicly traded limited company (UBS) formed under the laws of Switzerland. No publicly traded corporation owns 10% or more of UBS Group AG's stock. [ECF 13 at 4].

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant, David Efron ("Efron") respectfully requests that this Court hear oral argument in this matter. This appeal presents a question regarding the validity of an arbitration Award issued by FINRA arbitrators where: FINRA requires that all awards contain a summary of the issues resolved by the arbitrators; the arbitrators were appointed to resolve the interpretation and enforceability of an indemnification provision in the parties' agreement and the jurisdictional law to apply when making those determinations; and the Award does not contain any of these issues as issues the arbitrators resolved. Oral argument is proper, and Efron asserts oral argument will assist the Court in its decisional process.

# Table Of Contents

**Page**

CERTIFICATE OF INTERESTED PERSONS AND
    CORPORATE DISCLOSURE STATEMENT…………………............... C-1
STATEMENT REGARDING ORAL ARGUMENT ............................................. i
TABLE OF CONTENTS........................................................................... ii
TABLE OF CITATIONS ......................................................................... iv
STATEMENT OF JURISDICTION...............................................................1
STATEMENT OF THE ISSUES..................................................................1
STATEMENT OF THE CASE....................................................................3
STANDARD OF REVIEW .....................................................................12
SUMMARY OF THE ARGUMENT ..........................................................13
ARGUMENT .....................................................................................16

I.    The District Court Erred as a Matter of Law by Concluding that the Arbitrators were not Required to Identify Interpretation and Enforceability of the Contractual Indemnification Language and Choice-of-Law Conflict as Issues they Resolved in the Award...............16

    A. The District Court's findings regarding the omissions in the Award .....................................................................17

    B. The parties contractually agreed to a FINRA arbitration and to be bound by its rules and procedures..................................................18

    C. FINRA Rule 12904(e) requires that the Award identify every issue the arbitrators resolved..................................................19

    D. The Award is fatally flawed ...........................................20

II.    The District Court Erred as a Matter of Law by Concluding that the Omissions in the Award were not Grounds to Vacate the Award ...........22

III.    The District Court Erred as a Matter of Law by Concluding these Omissions From the Award as Issues the Arbitrators Resolved Did Not Rise to the Level of Misconduct Under § 10(a)(3) ..................................23

IV.    The District Court Erred as a Matter of Law by Concluding that the Omission of these Issues From the Award as Issues the Arbitrators Resolved Was Not Grounds to Vacate the Award Under § 10(a)(4).......24

A. The MAA is clear and unambiguous ............................................26

B. Even if the MAA is ambiguous, there is no evidence that the arbitrators interpreted the language to determine the parties' intent..............................................................................................29

C. *Pochat* does not change that conclusion ........................................33

V. The District Court Erred as a Matter of Law by Concluding Vacatur Was Not Required Because Efron Suffered No Prejudice.......................34

A. To make Efron, a customer, liable for losses incurred by a third party due to UBS's negligence defies comprehension .................34

B. The prejudice is obvious ...............................................................35

VI. The District Court Erred as a Matter of Law by Concluding that the Omission in the Award that the Arbitrators Resolved the Choice-of-Law Conflict Did Not Require Vacatur of the Award ....................................36

A. The arbitrators committed misconduct and exceeded their authority by issuing an Award that did not identify the choice-of-law conflict as an issue they resolved ...............................................................36

B. Efron is prejudiced by the arbitrators' failure to perform the choice-of-law analysis and resolve which law to apply to determine the enforceability of the indemnification provision......40

VII. The Unreasoned Award Cannot Reasonably be Interpreted as Being Based on UBS's Equitable Claims...........................................................44

VIII. The District Court Erred by Concluding that the Award Was Not the Product of UBS's Misconduct..............................................................48

IX. The Attorney's Fees Portion of the Award Must Also be Vacated..........52

CONCLUSION .....................................................................................................52

CERTIFICATE OF SERVICE……………………………………………… 53

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)……………………….. 54

# Table of Citations

**Cases**                                                                                              **Page(s)**

*Blue Circle Atlantic Inc. v. Independent Workers of North America, Local 429*,
  1990 WL 120948 (N.D.N.Y 1990) .........................................................................29

*Cabrera v. Doval*,
  76 P.R.R. 728 (1954) ................................................................................... 41, 43

*Candelario Del Moral v. UBS Financial Services Inc. of Puerto Rico*,
  699 F.3d 93 (1st Cir. 2012) ...........................................................................6

*Carrasquillo v. Am. Missionary Association*,
  61 P.R.R. 837 (1943) .....................................................................................41

*Castro v. Supermercado de Descuentos*,
  99 P.R.R. 826 (1971) .....................................................................................41

*Chico v. Editorial Ponce, Inc.*,
  101 D.P.R. 759, 1 P.R. Offic. Trans. 1036 (P.R. S.Ct. 1973) ................41

*Continental Casualty Co. v. Certain Underwriters at Lloyds of London*,
  10 F4th 814 (7th Cir. 2021) ....................................................................13

*Cotiviti, Inc. v. Deagle*,
  501 F.Supp. 3d 243 (S.D.N.Y. 2020)................................................. 38, 39

*Del Moral v. UBS Fin Serv's, Inc. of P.R.*,
  2016 WL 1275038 (U.S. Dist. Ct. P.R. 2016) ............................ 7, 16, 48

*Delta Airlines, Inc. v. Douglas Aircraft Company*,
  47 Cal. Rptr. 518 (1966) ........................................................................42

*Deweese v. Reinhard*,
  165 U.S. 386 (1897) ...............................................................................46

*Donna v. Con Edison*,
  337 N.Y.S.2d 722 (1972) ........................................................................42

*Dr. Jose S. Belaval, Inc. v. Perez-Perdomo*,
  488 F.3d 11 (2007) ..................................................................................47

*Efron v. UBS Financial Services Inc. of Puerto Rico*,
  300 So. 3d 733 (Fla. 3d DCA 2020)........................................................8, 9

*Fed. Ins. Co. v. Am. Home Assurance Co.*,
    639 F.3d 557 (2d Cir. 2011) ....................................................39

*Finance One Public Co. Ltd. v. Lehman Bros. Special Financing, Inc.*,
    414 F.3d 325 (2d Cir. 2005) .................................................. 37

*Fleetwood Services, LLC v. Ram Capital Funding, LLC*,
    2022 WL 1997207 (S.D.N.Y. 2022) ....................................38

*Goodman v. Olsen*,
    305 So.2d 753 (Fla. 1974) ......................................................37

*Gov't Emps. Ins. Co. v. Grounds*,
    332 So.2d 13 (Fla. 1976) .........................................................37

*Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*,
    17 F.Supp.2d 275 (1998)................................................. 44, 45

*Hall St. Assocs, LLC v. Mattel, Inc.*,
    552 U.S. 576 (2008) ...............................................................22

*Henningsen v. Bloomfield Motors, Inc.*,
    161 A.2d 69 (1960).................................................................42

*Higgins v. West Bend Ins. Co.*,
    85 So.3d 1156 (Fla. 5th DCA 2012) ......................................37

*Hoteles Condado Beach, La Concha and Convention Ctr. v. Union De Tronquistas*,
    763 F.2d 34 (1st Cir. 1985) ....................................... 28, 29, 32

*Houston Lighting & Power Co. v. Int'l Bhd. Of Elec. Workers, Local Union No. 66*,
    71 F.3d 179 (5th Cir. 1995)............................................ 26, 32

*Inter-City Gas Corp. v. Boise Cascade Corp.*
    845 F.2d 184 (8th Cir. 1998)......................................... 29, 32

*Int'l Bus. Machines Corp. v. Mueller*,
    2017 WL 4326114 (S.D.N.Y. 2017) ......................................38

*Jose Garriga, Hijo, Inc. v. Condominio Marbella del Caribe Oeste y Otros*,
    143 D.P.R. 927 (1997)..............................................................45

*Kansas City Power & Light Co. v. United Tel. Co. of Kan.*,
    458 F.2d 177 (1972) ...............................................................42

*Keystone Driller Co. v. General Excavator Co.*,
    290 U.S. 240 (1933) ...............................................................46

*Lumbermens Mut. Cas. Co. v. August*,
    530 So.2d 293 (Fla.1988) ....................................................37

*Major League Baseball Players Assn. v. Garvey*,
    532 U.S. 504 (2001) ..........................................................24

*Mun. de Quebradillas v. Corp Salud Lares*,
    180 D.P.R. 108 (2011) ......................................................45

*Nasca v. Greene*,
    216 A.D. 3d 648 (N.Y. S.Ct. App. 2023)..............................45

*Oxford Health Plans LLC v. Sutter*,
    559 U.S. 564 (2013) .................................................. 24, 32

*Pochat v. Lynch*,
    No. 12-22397-CIV,  2013 WL 4496548,
    (S.D. Fla. Aug. 22, 2013) ........................................ 3, 15, 33

*Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*,
    324 U.S. 806 (1945) ..........................................................47

*Puerto Rico Tel. Co. v. SprintCom, Inc.*,
    662 F.3d 74 (1st Cir. 2011) ................................................44

*Raymond James Financial Services, Inc. v. Fenyk*,
    789 E.3d 59 (1st Cir. 2015) ...............................................24

*Rivera v. San Juan Racing*,
    1058 90 P.R.R. 405 (1964)................................................41

*Samer Serv. Station Corp. v. Gasolinera Shell Fairview*,
    2017 P.R. App. LEXIS 2524 (2017) ...................................43

*Sears, Roebuck & Co. v. Teamsters Local Union No. 243*,
    683 F.2d 154 (6th Cir. 1982)...................................... 26, 32

*Secured Systems Technology, Inc. v. Frank Lill & Son, Inc.*,
    2010 WL 11549354 (W.D.N.Y. June 17, 2010) ...................37

*Spirit of the East, LLC v. Yale Products, Inc.*
    2023 WL 2890013 (11th Cir. 2023) ......................... 13, 24, 32

*Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp.*,
    559 U.S. 662 (2010) ................................... 24, 32, 34, 40

*Sturiano v. Brooks*,
    523 So.2d 1126 (Fla.1988) ................................................37

*Texaco Puerto Rico, Inc. v. Department of Consumer Affairs*,
    60 F.3d 867 (1995) ..........................................................47

*United States Soccer Federation, Inc. v. United States National Soccer Team Players, Assoc.*,
838 F.3d 826 (7th Cir. 2016) ............................................................. 25, 32

*United States v. Moseley*,
980 F.3d 9 (2d Cir. 2020) ....................................................................38

*Vaqueria Tres Monjitas, Inc. v. Irizarry*,
587 F.3d 464 (2009) ............................................................................47

*Waco Export Company, Inc. v. Expreso Meteoro, Inc.*,
108 D.P.R. 309, 8 P.R. Offic. Trans. 317 (P.R. S.Ct 1979) ............ 41, 43

*Warrior Met Coal Mining, LLC v. United Mine Workers of America*,
28 F.4th 1073 (11th Cir. 2022)............................................................25

*Welsbach Elec. Corp. v. MasTec N. Am., Inc.*,
859 N.E.2d 498 (N.Y. 2006) ...............................................................38

*Wiregrass Metal Trades Council AFL-CIO v. Shaw*,
837 F.3d 1083 (11th Cir. 2016)................................................. 25, 26, 30

*Zerman v. Ball*,
735 F.2d 15 (2d Cir. 1984) ..................................................................38

## Statutes

28 U.S.C. § 1291 ..................................................................................1
28 U.S.C. § 1332 ..................................................................................1
9 U.S.C. § 10(a)(1) ...........................................................................2, 13
9 U.S.C. § 10(a)(2) ...........................................................................2, 13
9 U.S.C. § 10(a)(3) ..................................................................... *passim*
9 U.S.C. § 10(a)(4) ..................................................................... *passim*
682.13(3), Florida Statutes ..................................................................9

## Rules

Rule 32(b)(1) of the Administration of the
Court of First Instance of Puerto Rico...................................................6, 7

31 L.P.R.A. § 4 ...................................................................................41

**Other Authorities**

FINRA Rule 12904(e) ............................................................. *passim*

STORY'S EQUITY JURISPRUDENCE (14th ed.) § 98)................................46

**STATEMENT OF JURISDICTION**

The District Court had diversity jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.

This Court has jurisdiction under 28 U.S.C. § 1291 because this appeal arises from a final judgment signed by the District Court and entered on the docket on October 25, 2023 [EFC 72], and Appellant timely filed his notice of Appeal on November 24, 2023. [EFC 76].

**STATEMENT OF THE ISSUES**

The matter before the arbitrators was a simple contract dispute between UBS Financial Services of Puerto Rico (now UBS Financial Services, Inc.) ("UBS") and its customer, David Efron ("Efron"). UBS asserted that, based on UBS's Master Account Agreement ("MAA") UBS claimed Efron signed when he opened his investment accounts, Efron was required to indemnify UBS for UBS's acts of negligence resulting in damages to a third party. UBS advances this argument even though the MAA does not contain language explicitly requiring Efron to indemnify UBS for UBS's own negligence. The only matters properly before the arbitrators were the interpretation of the indemnity provision in the MAA and the enforceability of this provision. The resolution of these issues depended on which jurisdictional law applied.

The matter was submitted to the Financial Industry Regulatory Authority ("FINRA") for arbitration. [ECF 10-3]. After the arbitrators issued an Award in favor of UBS [ECF 10-21], Efron moved to vacate the Award [ECF 58], arguing that the arbitrators conducted a fundamentally unfair arbitration that deprived him of his right to a fair hearing and issued a legally defective Award depriving him of his right to due process.

Specifically, Efron contended that: (1) FINRA Rule 12904(e) required that the arbitrators identify all issues they resolved in the Award; (2) the Award failed to identify critical issues as having been resolved by the arbitrators; (3) the arbitrators committed misconduct and exceeded their authority or so imperfectly executed it that a mutual, final and definite Award upon the subject matter was not made, which constituted grounds to vacate the Award under 9 U.S.C. § 10(a)(3) and § 10(a)(4) of the Federal Arbitration Act ("FAA"); and (4) the Award was procured by undue means under 9 U.S.C. § 10(a)(1), evident partiality or corruption of the arbitrators under § 10(a)(2), and/or misconduct under § 10(a)(3), which prejudiced Efron's right to a fair hearing, by permitting UBS to inject highly prejudicial and completely irrelevant evidence and argument into the hearing. [ECF 58].

After briefing, the District Court entered an Order confirming the Award and denying Efron's Motion to Vacate. [ECF 70].

In this appeal Efron claims the District Court:

1.  erred both factually and as a matter of law when it concluded that because the arbitrators were not required to issue a reasoned Award, they did not violate FINRA Rule 12904(e) when they failed to identify interpretation and enforceability of the indemnification provision in the MAA or the choice-of-law issue as issues they resolved in the Award, and therefore "it cannot be said that they exceeded or imperfectly executed [their] powers" under 9 U.S.C. § 10(a)(4), or committed misconduct under 9 U.S.C. § 10(a)(3), [ECF 70 at 5];

2.  misinterpreted Efron's arguments regarding the conflict in New York's and Puerto Rico's law on indemnification, and erred as a matter of law by refusing to consider the merits of Efron's claims under Puerto Rico law, *id*. at 3, note 1;

3.  erred as a matter of law when it concluded that the failure of the arbitrators to comply with FINRA Rule 12904(e) was not grounds for vacatur based on its (1) reliance on *Pochat v. Lynch*, No. 12-22397-CIV, 2013 WL 4496548, at *10 (S.D. Fla. Aug. 22, 2013); and (2) because Efron was unable to cite to a prior case involving a Rule 12904(e) violation, whereas *Pochat* dealt with a procedural discovery violation and evidentiary rulings, and FINRA Rule 12904(e) sets forth mandatory substantive requirements regarding the content for all FINRA Awards, *id*. at 5, note 2; and

4.  factually erred when it concluded that there was no evidence to support Efron's assertion that by permitting UBS to introduce irrelevant, highly prejudicial evidence (including evidence of the first arbitration, conducted *ex parte* and reversed on appeal, especially where the trial court on remand ordered that the arbitration be conducted before a new panel of untarnished arbitrators), and to attack Efron's character, denied Efron of his right to fair hearing, *id*. at 7, where the objected-to evidence and arguments permeated and became a feature of the arbitration.

## STATEMENT OF THE CASE

The saliant facts are not in dispute. In 2001, Efron's marriage to Madeleine Candelario Del Moral ("Candelario") was dissolved. [ECF 44-1 at 40; 47-1 at 13-

14]. Because it was anticipated that it would take three years to determine and distribute the marital assets, a Miami-Dade Circuit Court ordered Efron to pay Candelario $20,000 a month for three years, totaling $750,000. [ECF 47-1 at 31-32]. Efron paid the one-time $750,000 distribution and an additional $50,000 ordered by the Florida court up front before the case was transferred to Puerto Rico. [ECF 47-1 at 32]. Meanwhile, Candelario sought an advancement towards the distribution of the marital assets, falsely claiming that the assets held in various corporations inherited by Efron when his father, a developer, died were marital assets subject to distribution. *Id.*

To advance her false claims against Efron's assets, Candelario obtained discovery subpoenas in 2005 **specifically limited to the years of the marriage,** which ended in 2001, to identify pre-dissolution assets which might be subject to the marital property distribution. [ECF 44-1 at 44; 45-1 at 50-51; 47-1 at 28-29]. UBS, however, admits it improperly produced Efron's confidential financial documents regarding several investment accounts he opened well after the divorce, containing non-marital funds which were completely outside the scope of the subpoena. [ECF 44-1 at 43; 45-1 at 51, 54, 61-63, 70-71]. The production of these documents was a violation of the court order and a breach of UBS's fiduciary duty to Efron to maintain the confidentiality of his account information.

In addition to UBS's illegal release of Efron's confidential financial information, UBS failed to inform Efron about the breach, and **lied to him** when he discovered the breach. [ECF 48-1 at 31-37, 71-82]. As explained by Miguel Coll, a UBS financial advisor, UBS repeatedly denied it had released the documents to Candelario until Efron provided Coll with what Coll described as "the smoking gun." [ECF 48-1 at 37; 45-1 at 56].

Armed with the confidential financial information improperly produced by UBS, reflecting sizable assets in the UBS accounts, Candelario obtained a court order requiring Efron to pay her $50,000 a month as an "advancement" towards the distribution of the marital assets, [ECF 47-1 at 31-36; 49-1 at 67-78], and a judgment in 2006 for the arrears, which the court applied retroactively to 2001. [ECF 47-1 at 31-36]. Pursuant to that judgment, Candelario served UBS with an attachment order freezing and permitting her to collect $4.1 million plus interest from Efron's UBS accounts. [ECF 44-1 at 35-36; 45-1 at 71].

Efron objected to the advancement, arguing it was excessive and unreasonable because the assets upon which it was based were non-marital assets he inherited from his father. Efron's representations have proven to be true. Eighteen of the twenty-three assets Candelario sought to have distributed to her have been resolved so far and all have been determined to be **non-marital assets**. [ECF 44-1 at 43; 46-1 at 157-58, 160; 53-1 (IB) at 10-11].  These judicial determinations, however, have

taken considerable time during which Candelario has received sizable advancements, court orders, and a judgment for assets that have now been determined to be **non-marital and thus not subject to distribution**, and which she must return when the post-dissolution proceedings conclude. [46-1 at 160].

Efron challenged the garnishment in the Puerto Rico Court of First Instance, and at a hearing conducted on November 13, 2006 [ECF 44-1 at 86; 55-1 at 9], the court agreed with Efron, orally set aside the garnishment, and issued a "minute" of the proceedings, but never signed the minute, issued a written order, or "notified" the parties [ECF 47-1 at 41-43], as required by Rule 32(b)(1) of the Administration of the Court of First Instance of Puerto Rico. *Candelario Del Moral v. UBS Financial Services Inc. of Puerto Rico*, 699 F.3d 93, 101-102 (1st Cir. 2012).

Although the court did not sign the minute, issue a written order, or "notify" the parties, UBS improperly lifted the restraints on the accounts, immediately **paid itself** $177,578 [ECF 45-1 at 105], released approximately $7.5 million remaining in the line of credit UBS had extended to Efron to UBS's affiliate, USB Bank USA, and received approximately $1.2 million in margin owed in another account, thus reducing the funds in the accounts from approximately $11 million to less than $3.5 million [ECF 44-1 at 83-85; 45-1 at 72-73, 78-79; 47-1 at 45-46], which was further reduced by Efron over time to pay other creditors. *Id*.

After protracted litigation, Candelario eventually obtained an order from the Puerto Rico Court of First Instance ordering UBS to sell all assets up to $4,160,522.61 to satisfy her judgment and to "maintain all of David Efron's accounts frozen" until further order by the court. Although Candelario was in contact with UBS throughout the court proceedings, UBS did not inform Candelario (or the court) that it released the restraints on the accounts, UBS and Efron had removed most of the assets, and only $351,783.13 remained. [ECF 45-1 at 80-82; 50-1 at 26].

In August 2008, Candelario sued UBS in federal district court in Puerto Rico for removing the court-ordered restraints and allowing UBS and Efron to deplete the accounts without legal authority. *Del Moral v. UBS Fin Serv's, Inc. of P.R.*, 2016 WL 1275038, at *3 (U.S. Dist. Ct. P.R. 2016); [ECF 43-5]. UBS spent eight years and millions of dollars unsuccessfully litigating the matter with Candelario despite the court order restraining the accounts and the clear language of Rule 32(b)(1) requiring a written signed order from the court before releasing the restraints on the accounts. [ECF 44-1 at 87].

A judgment was ultimately entered on March 31, 2016, finding that UBS's release of the restraints on the accounts was negligent and that its negligence resulted in damages to Candelario in the amount of $4,725.629. *Del Moral*, 2016 WL 1275038, at *36. UBS did not appeal the judgment and settled with Candelario for $4.45 million. [ECF 44-1 at 131-33].

After settling with Candelario, UBS demanded that Efron indemnify it for the $4.45 million it paid Candelario to settle her judgment against UBS and for the millions of dollars it paid two teams of lawyers to defend its indefensible negligence. [ECF 50-1 at 116-117]. When Efron refused, [ECF 50-1 at 120-26], UBS invoked the arbitration clause in the MAA, and the parties proceeded to arbitration conducted by FINRA. [ECF 10-3 at 2]. Eleven days prior to the Final Hearing in 2019, Efron's attorney withdrew from the case. Recognizing the impossibility of obtaining new counsel on such short notice, Efron filed a motion seeking a 60-day postponement of the Final Hearing to retain new counsel. Although no prior continuance had been granted, UBS led the arbitration panel into error by objecting to the continuance and convincing the panel to try the case *ex parte* even though Efron was unrepresented by counsel and was, himself, unavailable. [ECF 53-1, (IB) at 17-19]; *Efron v. UBS Financial Services Inc. of Puerto Rico*, 300 So. 3d 733, 735-36 (Fla. 3d DCA 2020). UBS then led the trial court into error by moving to confirm the award and convincing the Florida court to sign a 16-page order UBS presented for the first time at the hearing on its motion to confirm, containing numerous factual findings unsupported by the record. [ECF 22-18 at 34-38].

On February 12, 2020, the Third District Court of Appeal reversed the arbitration award and remanded for a new arbitration hearing, finding that the arbitrators committed misconduct by denying Efron's motion for a continuance,

where no prior continuance had been granted, and that the misconduct deprived Efron of a fair hearing. *Efron*, 300 So. 3d at 736-37. UBS unsuccessfully moved for rehearing and rehearing *en banc* [ECF 57-1 at 4], and review by the Florida Supreme Court. [ECF 57-1 at 7].

Upon remand, UBS fought to have the rehearing conducted before the same panel that committed the misconduct. [ECF 23-1 at 4]. Efron objected based on the Third District Court's finding of misconduct, which under section 682.13(3), Florida Statutes, mandates that the rehearing be conducted before a new panel of arbitrators. Additionally, based on UBS's obvious influence over the FINRA arbitrators and the behavior of the first FINRA panel, Efron sought to have the matter submitted to a non-FINRA arbitration. [ECF 23-4]. After briefing and argument, the trial court ordered that the arbitration be re-submitted to FINRA for arbitration but assigned to a new panel of arbitrators. [ECF 23-10].

Upon remand to FINRA, Efron requested sixty (60) days to retain counsel to represent him. [ECF 24-2 at 43]. It is undisputed that Efron's request was not honored and three new arbitrators were selected without his input or approval. [ECF 24-2 at 4, 47]. On April 22, 2021, Efron wrote to FINRA objecting to FINRA's failure to honor his request. [ECF 24-2 at 43]. Thereafter, FINRA issued an "Initial Prehearing Conference Scheduling Order" stating that "[a]n initial prehearing telephonic conference was held in the above captioned matter on 06/08/21." Section

2 of the Order states: "The following arbitrator(s) participated in the hearing." After this statement, the Order inexplicably lists all six arbitrators: the three arbitrators selected without Efron's input after remand **and the three disqualified arbitrators**. The notice also **falsely states that the parties had accepted the composition of the arbitration panel** even though FINRA, UBS, and UBS's counsel were all clearly aware that Efron, who was unrepresented by counsel, had not participated in the selection of the panel and did not approve of its composition. [ECF 24-2 at 5, 47].

Two different renditions of this Scheduling Order were subsequently produced: one by UBS showing that the only boxes checked off next to the six names as having participated at the hearing were the three new arbitrators unilaterally selected by UBS and FINRA, and the other received by Efron showing all six boxes shaded in reflecting the participation of all six arbitrators at the hearing. UBS accused Efron of tampering with the document. Efron denied tampering with the document and claimed that UBS's representation that a scheduling order with all six boxes shaded in had not been issued by FINRA, was false. [ECF 24-2; 24-2 at 114-16].

Because Efron was not yet represented in the arbitration proceedings, he did not attend the hearing, so he did not know if the three disqualified arbitrators had appeared or participated at the hearing. To resolve the conflict over the documents and determine what involvement, if any, the three disqualified arbitrators may have

had in the proceedings and whether the new panel had been tainted, the undersigned counsel subpoenaed the arbitrators for deposition. [ECF 26-11]. All were duly served, **no protective order was sought or obtained**, but "upon advice of counsel," no one appeared for deposition, including one arbitrator who was not represented by counsel and who had called the undersigned's office to obtain the ZOOM information and had agreed to attend the deposition. [ECF 26-14, 15, 16; 27-1, 2, 3, 4].

Both Efron's counsel and UBS's counsel moved for sanctions. [ECF 24-2; 24-3; 27-4]. These motions were not heard or resolved and FINRA has not explained why it listed all six arbitrators in the Scheduling Order, and falsely represented that Efron had participated in the selection and approval of the new panel. Because the new arbitrators withdrew from the case, and the arbitration was conducted before a panel approved by both Efron and UBS, Efron and UBS agreed not to pursue their motions as moot, and there has been no determination of those issues.

The final arbitration hearing was conducted from August 29 to September 2, 2022, and an Award was issued on November 2, 2022, in favor of UBS. [ECF 10-21]. The unreasoned Award issued without explanation, finds Efron is liable to UBS for $4,450,000.00 in compensatory damages, $529,854.80 in interest, and $1,501000.00 for UBS's attorney's fees and costs. *Id*.

On November 4, 2022, UBS filed its Motion to Confirm the Award ("Motion to Confirm") in Miami-Dade Circuit Court. [ECF 9]. On December 1, 2022, Efron removed the matter to the United States District Court because during the arbitration proceedings UBS merged with another UBS entity, thus creating diversity jurisdiction. [ECF 1]. UBS did not oppose the removal [ECF 7], and on December 15, 2022, UBS filed its Memorandum of Law in Support of its Motion to Confirm [ECF 9]; on January 25, 2023, Efron filed a Combined Motion to Vacate the Award and Response to UBS's Motion to Confirm the Award ("Motion to Vacate") [ECF 58]; on February 8, 2023, UBS filed its Response to Efron's Motion to Vacate and Reply to its Motion to Confirm [ECF 61]; and on February 15, 2023, Efron filed a Reply to his Motion to Vacate. [ECF 68].

On September 25, 2023, the District Court entered an Order granting UBS's Motion to Confirm and denying Efron's Motion to Vacate [ECF 70]. On October 25, 2023, the District Court entered a Final Judgment, reserving jurisdiction as to UBS's motion for attorney's fees and costs. [ECF 72]. Efron timely filed his notice of Appeal on November 24, 2023. [EFC 76]. UBS's Motion for fees and costs remains pending.

## STANDARD OF REVIEW

"When reviewing an appeal from an order confirming an arbitration award or denying a motion to vacate an arbitration award, we review the district court's legal

conclusions *de novo* and its factual findings for clear error." *Spirit of the East, LLC v. Yale Products, Inc*. 2023 WL 2890013 at *2 (11th Cir. 2023); *Continental Casualty Co. v. Certain Underwriters at Lloyds of London*, 10 F.4th 814, 819 (7th Cir. 2021).

## SUMMARY OF THE ARGUMENT

Section 9 U.S.C.A. of the Federal Arbitration Act ("FAA"), which both parties agree governs this arbitration [ECF 9 at 10; 58 at 9], provides very limited grounds for judicial vacatur of an arbitration award, which include § 10(a)(1), where the award was procured by undue means; § 10(a)(2), where there was evident partiality by the arbitrators; § 10(a)(3), where the arbitrators were guilty of misconduct or other misbehavior that prejudiced the rights of a party; and § 10(a)(4), where the arbitrators exceeded their powers or so imperfectly executed them that a mutual, final, and definite award upon the subject matter was not made. All four of these grounds were established, prejudice to Efron was obvious, and the District Court's Order granting UBS's Motion to Confirm and denying Efron's Motion to Vacate contains dispositive errors in both law and fact, which require reversal of the Judgment on appeal.

Upon remand by the Third District Court of Appeal, Efron objected to arbitration before FINRA based on the misconduct of UBS and the first FINRA arbitrators, and his belief that he would not receive a fair hearing by FINRA. [ECF

23-4]. UBS, however, argued that the MAA required that the matter be arbitrated by FINRA, insisted that the arbitration be returned to FINRA, and fought to have it heard by the very same panel that had committed the misconduct. [ECF 23-1]. The trial court ordered that the matter be returned to FINRA but that it be heard by a new panel. [ECF 23-10].

Efron's concerns were justified. Upon remand, although Efron requested time to retain counsel [ECF 24-2 at 34], FINRA selected three new arbitrators without Efron's input or approval, conducted a hearing before Efron was able to retain counsel, and **falsely represented** that Efron had approved the newly selected arbitrators. [ECF 24-2 at 4, 43, 116]. Ultimately, a third panel was selected and a final hearing was conducted. That panel overruled nearly every one of Efron's objections to irrelevant, highly prejudicial hearsay evidence, allowed UBS to make the improperly admitted evidence a feature of the trial, and put Efron on trial rather than trying the matter it was authorized to arbitrate: a simple contract dispute requiring interpretation and enforceability of a contractual provision and whether to apply Puerto Rico or New York law in making those determinations. Because the choice-of-law was a critical determination in this matter, Efron's counsel requested that the arbitrators issue a reasoned award. [ECF 48-1 at 200]. UBS objected to a reasoned award, *id*., which is telling in of itself, and the arbitrators followed UBS's direction and did not issue a reasoned award. [ECF 10-21].

Although the arbitrators were not required to issue a reasoned award, the District Court erred as a matter of law by concluding that the arbitrators did not commit misconduct under 9 U.S.C. § 10(a)(3), or exceed or imperfectly execute their powers under 9 U.S.C. § 10(a)(4), when they failed to consider and/or resolve the singularly most important issues before them: whether the contractual language required Efron to indemnify UBS for UBS's negligence resulting in damages to a third party, which jurisdiction's law to apply, or identify these issues in the Award as issues they resolved as **mandated** by FINRA Rule 12904(e). [ECF 70 at 5]. Additionally, the Court's reliance on *Pochat* for the proposition that a violation of FINRA Rule 12904(e) did not require vacatur of the Award was, respectfully, misplaced as *Pochat* dealt with an evidentiary ruling regarding a discovery violation, not a violation of a mandated requirement regarding the substance of a FINRA Award.

The District Court additionally erred as a matter of law by refusing to consider the merits of Efron's claims under Puerto Rico law [ECF 70 at 3, note 1] because it was undisputed that under Puerto Rico law UBS's indemnification provision fails as a matter of law, and thus establishes clear prejudice.

Lastly, the District Court erred as a matter of law when it concluded that a party may only challenge an evidentiary ruling by the arbitrators if the ruling involved a refusal to hear material evidence, *id*. at 5; and factually erred when it

15

concluded that there was no record evidence to support Efron's assertion that by permitting UBS to introduce irrelevant, highly prejudicial evidence Efron was denied of his right to fair hearing, *id*. at 7, where the objected-to evidence permeated and became a feature of the arbitration.

## ARGUMENT

**I.** **The District Court Erred as a Matter of Law by Concluding that the Arbitrators were not Required to Identify Interpretation and Enforceability of the Contractual Indemnification Language and Choice-of-Law Conflict as Issues they Resolved in the Award**

That UBS was negligent and its negligence resulted in damages to Candelario were not in dispute. A judgment was entered in the Candelario/UBS litigation finding that UBS was negligent, resulting in $4,725,629 million in damages to Candelario. *Del Moral*, 2016 WL 1275038 at *36. UBS did not appeal the judgment and at arbitration admitted that: it was negligent, its negligence resulted in damages to Candelario, and nothing Efron said or did contributed to its negligence. [ECF 45-1 at 108-09, 159-160]. Thus, the sole issue submitted to arbitration was whether Efron should be required to indemnify UBS for UBS's payment of $4.45 million as settlement of that judgment, and its claimed millions of dollars in legal fees. Resolution of those issues required interpretation and the enforceability of the indemnification provision in the MAA, which, in turn, required resolution of the conflict on whether to apply New York or Puerto Rico law.

**A. The District Court's findings regarding the omissions in the Award**

Although the District Court's Order recognized that the interpretation and enforceability of the indemnification provision of the MAA, and resolution of which law to apply in making those determinations, were not identified as issues the arbitrators resolved in the Award, it makes the following findings: (1) because both parties did not request a reasoned award, "the 2022 Panel was not required to specifically discuss its choice-of-law analysis in the 2022 Award [ECF 70 at 4]; (2) FINRA Rule 12904(e) "does not require a full recitation of every issue resolved by the 2022 Panel [*id*.];" (3) the omission of these issues does not rise to the level of misconduct that would prejudice Efron [*id*. at 5]; and (4) "because the 2022 Panel was not required to issue a reasoned award, and therefore, did not violate FINRA Rule 12904(e), it cannot be said that the 2022 Panel exceeded or imperfectly executed its powers." [*Id*. at 5]. Respectfully, each of these findings was built upon the false premise that because the arbitrators were not required to issue a reasoned Award, they were not required to identify the singularly most critical and dispositive issues submitted to them for resolution. In fact, the issues they omitted as having been resolved by them were essentially the only issues they were granted the power to arbitrate.

Importantly, this was a FINRA arbitration, and as will be discussed more fully below, the FINRA arbitrators' powers and responsibilities were delineated by the

parties and FINRA's procedures and rules, promulgated by the Security and Exchange Commission ("SEC"). FINRA Rule 12904(e) mandates that all issues resolved by the panel **shall** be identified in the Award. Because the Award failed to identify the interpretation and enforceability of the indemnification provision relied on by UBS, and the choice-of-law conflict, as issues the panel resolved as mandated by FINRA Rule 12904(e), the District Court erred by not vacating of the Award under § 10(a)(3), and/or § 10(a)(4) of the FAA.

## B. The parties contractually agreed to a FINRA arbitration and to be bound by its rules and procedures

The District Court erred as a matter of law by finding that these dispositive issues did not have to be identified in the Award as issues the arbitrators resolved. As provided in the MAA [ECF 10-1 at 16], the parties submitted their controversy to a **FINRA** arbitration and specifically agreed that **they would be bound by FINRA's procedures and rules**. [ECF 10-3 at 2].

> 1. The undersigned parties ("parties") hereby submit the present matter in controversy, as set forth in the attached statement of claim…to arbitration in accordance with the FINRA By-Laws, Rules, and Code of Arbitration Procedure.

> 2. The parties hereby state that they or their representative(s) have read the procedures and rules of FINRA relating to arbitration, and **the parties agree to be bound by these procedures and rules**.

3. …The parties further agree and understand that the **arbitration will be conducted in accordance with the FINRA Code of Arbitration Procedure**.

*Id*. (emphasis added).

### C. FINRA Rule 12904(e) requires that the Award identify <u>every</u> issue the arbitrators resolved

Although the District Court correctly noted that there is no requirement under either FINRA rules or the FAA that the arbitrators issue a reasoned Award if both sides do not request one, the District Court erred as a matter of law by concluding that the arbitrators were not required to include interpretation and enforceability of the indemnification provision in the MAA and the choice-of-law conflict as issues they resolved in the Award. FINRA Rule 12904(e), promulgated by the SEC, **mandates** that certain information be contained in **every FINRA Award**:

> The Award **shall** contain the following:
> (4) A **summary of the issues**, including the type(s) of any security or product, in controversy;
> ….
> (7) A **summary of any other issues resolved**;

(emphasis added). Importantly, this is a **substantive** rule, not a procedural rule mandating the content of a FINRA Award.

Because both the arbitrators and the parties were bound by FINRA's rules and procedures promulgated by the SEC; FINRA Rule 12904(e) is a substantive rather than a procedural rule; and Rule 12904(e) requires that all issues resolved by the panel be identified in the Award, the District Court erred as a matter of law by

concluding that because the arbitrators were not required to issue a reasoned Award, they weren't required to identify all of the issues they resolved. FINRA Rule 12904(e) is not ambiguous or aspirational; it is mandatory. Rule 12904(e) mandates that the Award **shall** contain "(4) **A summary of the issues**, including the type(s) of any security or product, in controversy; and (7) **A summary of any other issues resolved**." (emphasis added). Thus, the initial premise upon which the District Court's Order was constructed is false. Rule 12904(e) requires that all issues resolved by the arbitrators be included in the Award.

### D. The Award is fatally flawed

It is undisputed that the Award does not contain the singularly most important issues that had to be "resolved" by the arbitrators in its "summary of the issues" or in a "summary of any other issues resolved" as mandated by the SEC in FINRA Rule 12904(e). It does not even mention interpretation of the indemnification clause in the MAA or the controversy over which jurisdictional law should be applied when determining the enforceability of an indemnification clause that does not contain any language explicitly indemnifying UBS from its own acts of negligence, or identify these issues as issues the arbitrators resolved.

The following is what the arbitrators provided in the Award by way of a "summary of the issues" as required by FINRA Rule 12904(e):

> Claimant asserted the following causes of action: contractual indemnification; unjust enrichment; and

equitable contribution. The causes of action relate to a post-judgment settlement payment that Claimant made to Respondent's ex-wife following litigation (the Candelario litigation") in the U.S. District Court for the District of Puerto Rico.

Unless specifically admitted in the Statement of Answer, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

In the Counterclaim, Respondent asserted the following causes of action: negligence; breach of implied contract; and breach of fiduciary duty. The causes of action relate to Claimant's handling of Respondent's account subsequent to a ruling made in the Candelario litigation.

Unless specifically admitted in the Answer to Counterclaim, Claimant denied the allegations made in the Counterclaim and asserted various affirmative defenses.

[ECF 57-1, Exh. 10 at 74]. The Award continues with the monetary relief requested

by UBS, *id*., and the following under "OTHER ISSUES CONSIDERED AND

DECIDED:"

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

During the hearing, Respondent requested a reasoned award and Claimant did not. The Panel did not provide an explanation.

The Award in this matter may be executed in counterpart copies.

*Id*. at 75. Conspicuously missing from the summary of issues the arbitrators resolved

are the interpretation of the contractual indemnification language in the MAA relied

on by UBS, which did not explicitly provide for indemnification for UBS's negligence, the enforceability of this provision, and which jurisdictional law to apply when making those determinations.

## II. The District Court Erred as a Matter of Law by Concluding that the Omissions in the Award were not Grounds to Vacate the Award

Efron recognizes that the FAA provides very narrow grounds to vacate an award. Section 10 of the FAA enumerates the four circumstances in which vacatur is allowed, and these four statutory bases are the exclusive grounds for vacatur. *Hall St. Assocs, LLC v. Mattel, Inc*., 552 U.S. 576, 584 (2008). Among the narrow grounds provided by the FAA are where the arbitrators are guilty of misconduct under § 10(a)(3) or where the arbitrators exceeded their powers or so imperfectly executed them that a mutual, final, and definite award upon the subject matter was not made, which is grounds for vacatur under § 10(a)(4). The District Court erred as a matter of law by concluding that the omissions in the Award did not rise to the level of misconduct under § 10(a)(3) or demonstrate that the arbitrators exceeded their powers or rendered the Award so indefinite as to require vacatur under §10(a)(4).

The issues omitted from the Award as having been resolved by the arbitrators were not just "any issues," they were "the issues" the panel was tasked with resolving. In fact, they were essentially the only issues submitted to them for resolution. By omitting these dispositive issues from the Award, the arbitrators either

22

failed to resolve these issues or issued an Award that failed to meet the unambiguous substantive requirements of a FINRA Award. Under either scenario, it constitutes grounds for vacatur under § 10(a)(3) and § 10(a)(4).

### III. The District Court Erred as a Matter of Law by Concluding these Omissions From the Award as Issues the Arbitrators Resolved Did Not Rise to the Level of Misconduct Under § 10(a)(3)

The arbitrators clearly committed misconduct. Only two possibilities exist for failing to identify the interpretation and enforceability of the indemnification language in the MAA, and which law to apply in making these determinations, as issues the arbitrators resolved in the Award. Either the arbitrators: (1) shirked their responsibility to resolve these issues; or (2) violated their responsibility and a clear substantive FINRA directive to identify all issues they resolved in the Award.

Since the arbitrators derived their powers from FINRA and the parties, and both the arbitrators and the parties agreed to be bound by FINRA's rules and procedures, their failure to resolve the most important, if not sole issues, they were charged with arbitrating, or simply ignored their duty to include them in the Award, constitutes misconduct. The entire dispute is based on those determinations. These omissions render the Award fatally flawed because it cannot be determined whether the Award was decided on the subject matter submitted, provides no evidence that the arbitrators interpreted the contractual language, and prejudices Efron because it denies him of his right to due process and a fair hearing.

**IV.** **The District Court Erred as a Matter of Law by Concluding That the Omission of These Issues From the Award as Issues the Arbitrators Resolved Was Not Grounds to Vacate the Award Under § 10(a)(4)**

As the Supreme Court found in *Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 663 (2010), "[a]n arbitration decision may be vacated under FAA § 10(a)(4) on the ground that the arbitrator exceeded his powers…'when [an] arbitrator strays from interpretation and application of the agreement and effectively dispense[s] his own brand of industrial justice.'" (quoting *Major League Baseball Players Assn. v. Garvey*, 532 U.S. 504, 509 (2001); *Raymond James Financial Services, Inc. v. Fenyk*, 789 E.3d 59, 64 (1st Cir. 2015).

Although an award may not be vacated because an arbitrator misinterpreted or even grossly misinterpreted a contract, the law is clear that it may be vacated if he failed to interpret the contract. *Oxford Health Plans LLC v. Sutter*, 559 U.S. 564, 569 (2013); *Stolt-Nielson S.A,.* 559 U.S. at 671. "That is because an arbitrator derives his or her powers from the parties' agreement to forgo the legal process and submit their disputes to private dispute resolution." *Stolt-Nielson S.A,.* 559 U.S. at 682. "Accordingly, the 'sole question for us is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong.'" *Spirit of the East,* 2023 WL 2890013 at *3 (quoting *Sutter*, 569 U.S. at 569).

There are two "guiding principles" that control the Court's analysis: (1) whether the arbitrators even arguably interpreted the parties' contract; and (2) an

arbitrator may not ignore the plain meaning of the contract. *Warrior Met Coal Mining, LLC v. United Mine Workers of America,* 28 F.4th 1073, 1078 (11th Cir. 2022); *Wiregrass Metal Trades Council AFL-CIO v. Shaw*, 837 F.3d 1083, 1087-88 (11th Cir. 2016).

In applying the first "guiding principle," the courts begin by looking at the relevant language in the agreement to determine if the language is open to interpretation. *Warrior Met Coal Mining*, 28 F.4th at 1078; *Wiregrass*, 837 F.3d at 1088 (finding arbitration award cannot contradict the express language of the agreement, and an arbitrator may not modify clear and unambiguous contract terms. However, an arbitrator can interpret the language of the agreement, and thus the threshold question is whether the language is open to interpretation); *Veolia Transportation Service, Inc*. 2016 WL 5405636 at *6 (S.D. Fla. 2016) (same).

If the contract is clear and unambiguous, an arbitrator exceeds his authority by adding to, modifying, or interpreting the agreement. *United States Soccer Federation, Inc. v. United States National Soccer Team Players, Assoc*., 838 F.3d 826, 835 (7th Cir. 2016) (finding that because there was no ambiguity "the arbitrator rewrote the contract and inscribed his own language upon the contract; something that he was not authorized to do…In both *Tootsie Roll* and *Anheuser-Busch*, this court vacated the arbitrator's awards because they ignored and contradicted the clear and unambiguous terms of the underlying agreements. And here, we vacate this

award for the same reasons.") (quotation marks and citations omitted); *Houston Lighting & Power Co. v. Int'l Bhd. Of Elec. Workers, Local Union No. 66*, 71 F.3d 179, 184 (5th Cir. 1995) ("If the language of the agreement is clear and unequivocal, an arbitrator is not free to change its meaning."); *Sears, Roebuck & Co. v. Teamsters Local Union No. 243*, 683 F.2d 154, 155 (6th Cir. 1982) ("An arbitrator may construe ambiguous contract language, but lacks the authority to disregard or modify plain or unambiguous contract provisions.").

### A. The MAA is clear and unambiguous

To determine whether the arbitrators engaged in interpretation rather than modification, this Court must begin by looking at the relevant language in the MAA and determine, as a threshold, whether the language is open to interpretation, *Wiregrass*, 837 F.3d at 1088, keeping in mind that the Court's task is to apply the text, not improve upon it. *Id*. at 1099. The indemnification provision in the MAA is as follows:

> …Client hereby agrees to indemnify UBS…against any losses arising from (a) **any and all Account transactions** effected or incurred by any person authorized to effect such transactions, including without limitation redemption of any shares of Funds…security transactions, Card transactions, Bill Payment Services and Electronic Funds Transfer Service transactions and (b) **and debits, charges, fees or other obligations in the Account**.

> Client shall at all times be liable for the payment of any amounts advanced, any debit balances or other **obligations owing in the Account** and Client shall be

liable to UBS… for any deficiency remaining in the Account in the event of liquidation…by either Client or UBS. Client further agrees to indemnify UBS…against any loss, cost, expense, liability or damages **arising out of Client's obligations hereunder.**

**Client will be liable for the reasonable costs and expenses of collection (including attorney's fees), for any unpaid losses, fees or other amounts owed by Client to UBS**…**or against which Client has indemnified UBS**…**under the preceding sentence**. Client shall be liable for any and all losses, claims, damages, penalties, fines, settlements, costs, causes of action, debts, dues, sums of money, accounts, accountings, reckonings, acts, omissions, demands, obligations, actions, suits, proceedings, judgments, liabilities and expenses (including without limitation all expenses of litigation or preparation therefor, whether or not UBS …is a party thereto) which UBS…pay or incur arising out of any claims by any person or entity in any way relating to this Account.

(emphasis added). [ECF 50-1 at 22].

As is readily obvious, the indemnification provision does not explicitly provide for indemnification for UBS's own acts of negligence. [ECF 10-1 at 22]. There is absolutely no language absolving UBS from its own negligence nor requiring Efron to essentially act as UBS's liability or malpractice insurer. Presumably, UBS has insurance to cover it for those purposes.

Besides not explicitly providing indemnification for UBS's negligence, the plain meaning of the terms within the indemnification provision are clear and unambiguous. Efron agreed to indemnify UBS for losses and attorney's fees

sustained by UBS relating to **Efron's account obligations**, not damages sustained by UBS due to its own negligence, as claimed by UBS. The first two paragraphs are directed to **Efron's account obligations**, and the third paragraph, by specific reference, refers to the preceding sentence, which, as already noted, pertains to **Efron's account obligations**. UBS's improper disclosure of Efron's confidential account information, which were outside of the subpoena [ECF 44-1 at 43; 45-1 at 51, 54, 61-63, 70-71]; lies to Efron about its improper disclosure [ECF 48-1 at 31-37, 71-82; 45-1 at 56]; release of the restraints on the accounts ordered by the court; and payments of millions of dollars to itself and its affiliates [ECF 44-1 at 83-85, 45-1 at 72-73, 78-79; 47-1 at 45-46] were totally unrelated to **Efron's account obligations**.

The indemnification provision is clear and unambiguous. The law is also clear: an arbitrator's disregard for the unambiguous language in an agreement requires vacatur of the award because the arbitrator has no authority to disregard or modify the terms of a contract. *Hoteles Condado Beach, La Concha and Convention Ctr. v. Union De Tronquistas*, 763 F.2d 34, 41 (1st Cir. 1985) (finding that although an "arbitrator has great latitude in construing ambiguous language in a contract, and a court must not vacate an arbitration award simply because the court disagrees with the arbitrator's construction of the contract….he is without authority to disregard or modify plain and unambiguous provisions") (citations omitted). And where an

arbitrator ignores the clear language in an agreement, vacatur of the award is appropriate. *Id*. at 42 (affirming the district court's order vacating the award and finding that because "the arbitrator ignored the clear language in the agreement, the award denied the parties of a full and fair hearing on the dispute and alters the provisions of the contract between the parties"). *See also Inter-City Gas Corp. v. Boise Cascade Corp*. 845 F.2d 184, 187 (8th Cir. 1998) ("As the Supreme Court has stated . . . '[t]he arbitrator may not ignore the plain language of a contract'….More specifically, if the arbitrator interprets unambiguous language in any way different from its plain meaning, the arbitrator amends or alters the agreement and acts without authority.") (citations omitted); *Blue Circle Atlantic Inc. v. Independent Workers of North America, Local 429*, 1990 WL 120948 at *3  (N.D.N.Y 1990) ("Although the arbitrator may interpret ambiguous language, the arbitrator may not disregard or modify unambiguous contract provisions.").

Because the MAA is clear and unambiguous, the arbitrators were required to apply its terms. The arbitrators disregarded the contractual terms. The District Court, therefore, erred by denying Efron's Motion to Vacate under § 10(a)(4).

### B. Even if the MAA is ambiguous, there is no evidence the arbitrators interpreted the language to determine the parties' intent

Although Efron submits that the indemnification provision is clear and unambiguous: it relates to Efron's account obligations and does not require Efron to indemnify UBS for UBS's own negligence, if this Court disagrees, the next step is

29

to determine whether the arbitrators interpreted and resolved the ambiguity. *Wiregrass*, 837 F.3d at 1090. Generally, that determination is made by looking at the arbitrator's reasoning. *Id.* However, in this case there is absolutely no evidence that the arbitrators even attempted to interpret the indemnification clause in the MAA, and the evidence reflects that UBS never intended to pass its negligence onto its account holders.

First, and most importantly, the arbitrators provided no reasoning. They chose to issue an Award with no analysis and they did not identify interpretation of the indemnification provision as an issue they resolved in the Award. Since they were required to identify all issues they resolved in the Award pursuant to FINRA Rule 12904(e), which is mandatory, one must conclude that they either ignored their responsibility to interpret the MAA or they did not resolve the issue. The same is true for the unresolved issue of whether an agreement that does not explicitly provide for indemnification by Efron for UBS's own negligence resulting in damages to a third party is enforceable, which in turn, required resolution of the disputed issue of which jurisdictional law to apply. The Award is absolutely silent as to resolution of these issues, which require the same conclusion: that the arbitrators either ignored their responsibility to resolve these issues or they failed to resolve them.

Second, the evidence reflects that UBS never intended to require account holders such as Efron to indemnify it for its own negligence. UBS acknowledged

that this is the **first time in the history of the company** that it has ever applied this clause, which is in **every** MAA, to seek indemnification from an account holder for a judgment entered against the company for damages as a result of its own negligence. [ECF 45-1 at 108-09, 159-60].

Mr. Crowley, UBS's in-house litigation specialist testified that there have been approximately 3,000 FINRA claims filed by customers, in the Puerto Rico branch of UBS alone, alleging negligence and misconduct by UBS [ECF 45-1 at 15]; the accounts of these customers included the same MAA that UBS claims was contained in the documents signed by Efron [ECF 45-1 at 20]; UBS has paid more than $400 million in settlements and $97 million in awards [ECF 45-1 at 21]; the total number of payments made is nearly $1 billion [ECF 45-1 at 22]; and **UBS has not once invoked the indemnification clause or sought indemnification from any customer other than Efron**. [ECF 45-1 at 23, 38, 229; 47-1 at 174]; [ECF 49-1 at 133 (SEC Cease and Desist Order); 49-1 at 146 (UBS's Acceptance of Settlement with the Financial Industry Regulatory Authority); 49-1 at 160 (article)].

Because there is no evidence that the arbitrators interpreted the indemnification provision in the MAA; the indemnification provision does not explicitly provide for indemnification for UBS's own negligence; and the only evidence regarding UBS's intent shows there UBS never intended to interpret the provision as requiring an account holder to indemnify UBS for its own negligence,

the arbitrators exceeded their authority by issuing an Award modifying the agreement and finding that Efron must indemnify UBS for UBS's negligence. The District Court, therefore, erred as a matter of law by concluding that there were no grounds to vacate the Award under subsection 10(a)(4). *See Stolt-Nielson S.A.* (vacating award, finding that "the panel makes a few references to intent, but none of these shows that the panel did anything other than impose its own policy preference" and thus "the award may be vacated under § 10(a)(4) of the FAA on the ground that the arbitrator exceeded [his] powers, for the task of an arbitrator is to interpret and enforce a contract"). *Id*. at 663, 671.

In this case it does not matter whether this Court concludes that the indemnification provision is ambiguous or not. If the Court concludes the provision is unambiguous, then the arbitrators ignored the clear language of the contract, which requires that the Award be vacated under § 10(a)(4). *United States Soccer Federation,* 838 F.3d at 835; *Houston Lighting & Power Co.*, 71 F.3d at 184; *Inter-City Gas Corp.*, 845 F.2d at 187; *Hoteles*, 763 F.2d at 41; *Sears, Roebuck & Co.*, 683 F.2d at 155. If the Court concludes the language is ambiguous, the Award must be vacated because there is no evidence that the arbitrators interpreted the language to determine the parties' intent, and thus modified rather that interpreted the contract, which also requires vacatur under § 10(a)(4). *Sutter*, 559 U.S. at 569; *Stolt-Nielson S.A,.* 559 U.S. at 671; *Spirit of the East,* 2023 WL 2890013 at *3.

### C. *Pochat* does not change that conclusion

The District Court's reliance on another district trial court's order in *Pochat* was, respectfully, misplaced. Pochat's motion to vacate was based on his claims of manifest injustice, which is no longer a permissible ground to vacate an award, and the panel's evidentiary rulings. *Pochat*, 2013 WL 4496548 at *8-9. The evidentiary rulings under attack in *Pochat* were the panel's ruling to admit late-produced documents and its refusal to impose sanctions for the alleged discovery violation. *Id*. at *10-11. The court found that these **discovery and evidentiary rulings** did not constitute "misbehavior" by the arbitrators or show they exceeded their authority, and that Pochat failed to demonstrate he was prejudiced. *Id*. at *11.

First, the district court correctly concluded that arbitrators have wide latitude regarding evidentiary rulings and vacatur is not required unless it can be shown that the ruling(s) were in bad faith or so gross as to amount to affirmative misconduct. *Id*. at *10. Second, it correctly noted that such "attacks must fail unless the arbitrator strays from interpretation and application of the agreement and effectively dispenses with its own brand of industrial justice." *Id*. at *11 (quotation marks and citations omitted). Third, *Pochat* involved a violation of a procedural discovery rule (the timing to produce discovery), whereas this case involves the violation of a mandated substantive rule regulating the contents of an Award. These are critical distinctions,

and that this omission may be one of first impression should have no bearing on the merits of the argument.

The omission of the interpretation of the indemnification provision in the MAA, its enforceability, and the choice-of-law conflict from the Award as issues the arbitrators resolved demonstrates either a clear violation of FINRA Rule 12904(e), a substantive rule that mandates what must be contained in a valid Award, or that the arbitrators failed to resolve those issues, which were the issues submitted to them to arbitrate. Either way, the arbitrators "stray[ed] from interpretation and application of the agreement and effectively dispense[d] with [their] own brand of industrial justice," *Stolt-Nielsen S.A*. 559 U.S. at 663, and thus committed misconduct under § 10(a)(3) or exceeded their authority under §10(a)(4), requiring vacatur of the Award.

## V. The District Court Erred as a Matter of Law by Concluding Vacatur Was Not Required Because Efron Suffered No Prejudice

### A. To make Efron, a customer, liable for losses incurred by a third party due to UBS's negligence defies comprehension

When considering whether the arbitrators committed misconduct under § 10(a)(3), or exceeded their powers or so imperfectly executed them that a mutual, final, and definite award upon the subject matter was not made under § 10(a)(4), one cannot ignore the absurdity of UBS's claim at arbitration: that an account holder can be liable for a major financial institution's negligence based on an indemnification clause in a master account agreement that does not explicitly state that the customer

is insuring the company for the company's own acts of negligence. The absurdity of this notion is highlighted by UBS's acknowledgment that this is the first time in the history of the company that it has ever applied this clause, contained in every MAA, to seek indemnification from an account holder for the company's negligence. [ECF 45-1 at 108-09, 159-60].

## B. The prejudice is obvious

The prejudice to Efron is obvious and is established as a matter of law. Had the arbitrators performed even a rudimentary examination of the contractual language, they would have been required to conclude that the indemnification provision is clear and unambiguous and contains no language obligating Efron to indemnify UBS for UBS's negligence, and would therefore have been compelled to enter an Award in favor of Efron. On the other hand, if the arbitrators concluded that the indemnification provision was ambiguous, they would have been required to construe the provision to determine the intent of the parties. That analysis would have revealed that the indemnification language specifically dealt with account transactions, not UBS's negligence in dealing with a court order obtained by a third party, and based on UBS's admissions, UBS never intended that the provision be construed to require indemnification by its account holders for its own acts of negligence. Either way, the Award would have been for Efron, not UBS. Lastly, even if the arbitrators improperly interpreted the agreement as requiring Efron to

indemnify UBS for its own negligence, they would have had to conclude that because the agreement did not explicitly provide for indemnification for UBS's negligence, it was unenforceable.

**VI.** **The District Court Erred as a Matter of Law by Concluding that the Omission in the Award that the Arbitrators Resolved the Choice-of-Law Conflict Did Not Require Vacatur of the Award**

   **A. The arbitrators committed misconduct and exceeded their authority by issuing an Award that did not identify the choice-of-law conflict as an issue they resolved**

The failure to include in the Award that the arbitrators resolved the choice-of-law conflict requires the same analysis and suffers the same infirmities as the failure to include any language reflecting that they interpreted the contractual indemnification language. UBS argued that New York law should be applied because the MAA contained a choice-of-law provision. Efron claimed that Puerto Rico law, which does not enforce broad indemnification clauses that do not explicitly provide for indemnification for a party's own negligence, should be applied because New York had no reasonable relationship to the parties or the transaction [ECF 58 at 14-16, 19-27], and under New York law, if New York has no reasonable relationship to the parties or the transaction, the contractual choice of New York in the MAA is unenforceable. [ECF 58 at 14-16].

Thus, the validity of the contractual choice-of-law clause was a threshold issue the arbitrators were **required to resolve** when determining the enforceability

of the indemnification provision. *Finance One Public Co. Ltd. v. Lehman Bros. Special Financing, Inc*., 414 F.3d 325, 332 (2d Cir. 2005) ("The validity of a contractual choice-of-law clause is a threshold question."); *see also Secured Systems Technology, Inc. v. Frank Lill & Son, Inc*., 2010 WL 11549354 at *4 (W.D.N.Y. June 17, 2010). Because the matter was arbitrated in Florida, the arbitrators were required to make that threshold determination applying Florida law. *Id*. Although Florida law controlled the validity of the contractual choice-of-law, the choice-of-law provision in the MAA is invalid under both Florida and New York law.

"Florida choice-of-law rules state that "[q]uestions bearing on the interpretation, validity, and obligation of contracts are substantive and governed by the rule of *lex loci contractus* [law of the place where the contract is made]." *Higgins v. West Bend Ins. Co*., 85 So.3d 1156, 1158 (Fla. 5th DCA 2012); *Sturiano v. Brooks*, 523 So.2d 1126, 1129–30 (Fla.1988); *Lumbermens Mut. Cas. Co. v. August*, 530 So.2d 293, 295 (Fla.1988); *Goodman v. Olsen*, 305 So.2d 753, 755 (Fla. 1974). However, "questions related to the manner or method of performance under a contract are determined by the law of the place of performance." *Higgins*, 85 So. 3d at 1158 (citing *Gov't Emps. Ins. Co. v. Grounds*, 332 So.2d 13, 14-15 (Fla. 1976). In this case, both the making of the contract and its performance were in Puerto Rico, not New York. Thus, under Florida law, the interpretation and validity of the choice-

of-law provision must be determined by applying Puerto Rico law, which is both the *lex loci contractus* and the place of performance.

New York law comports with this finding as New York courts will generally "enforce a choice-of-law clause so long as the chosen law **bears a reasonable relationship to the parties or the transaction**." *Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 859 N.E.2d 498, 500-01 (N.Y. 2006) (emphasis added); *see also United States v. Moseley*, 980 F.3d 9, 20 (2d Cir. 2020) ("New York law is unambiguous in the area of express choice of law provisions in a contract. Absent fraud or violation of public policy, contractual selection of governing law is generally determinative **so long as the State selected has sufficient contacts with the transaction**.") (citation and quotation marks omitted) (emphasis added); *Zerman v. Ball*, 735 F.2d 15, 20 (2d Cir. 1984*); Fleetwood Services, LLC v. Ram Capital Funding, LLC*, 2022 WL 1997207 at *15-16 (S.D.N.Y. 2022); *Int'l Bus. Machines Corp. v. Mueller*, 2017 WL 4326114, at *4 (S.D.N.Y. 2017). *See also Cotiviti, Inc. v. Deagle*, 501 F.Supp. 3d 243, 256 (S.D.N.Y. 2020) (applying New York law and noting that "[f]or contract claims, courts apply the 'center of gravity' or 'grouping of contacts' analysis, which looks at the contacts between the disputed contract and the relevant states….Factors to consider in this analysis include 'the place of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties.'").

This case and the underlying action have absolutely no connection to New York and New York has absolutely no "contacts with the transaction." It is not the "the place of contracting, negotiation and performance; the location of the subject matter of the contract; or the domicile of the contracting parties." Thus, it is neither the *lex loci contractus* nor where the parties were domiciled. Efron is and was domiciled in Puerto Rico. UBS was located in Puerto Rico, Efron opened the subject accounts at a UBS branch office in Puerto Rico, Efron's UBS financial advisor was licensed by the Puerto Rico Office of the Commissioner of Financial Institutions to act as a broker-dealer in Puerto Rico, and the conduct of its registered representatives is governed by federal and Puerto Rico securities laws and regulations. [ECF 55-1 at 2, footnote 1]. Additionally, the Candelario/UBS litigation was conducted in Puerto Rico before Puerto Rico's judges, the judgment was entered in Puerto Rico, and the settlement was reached in Puerto Rico. Even UBS's merger with UBS Financial Services, Inc. in 2021, offers no connection to New York as UBS Financial Services, Inc. is incorporated in Delaware with its principle place of business is in Weehawken, New Jersey. [ECF 1]. Thus, under both Florida and New York law, the contractual choice-of-law must be disregarded and the arbitrators were required to perform a traditional choice-of-law analysis. *See Cotiviti, Inc.*, 501 F.Supp. 3d at 256 (quoting *Fed. Ins. Co. v. Am. Home Assurance Co*., 639 F.3d 557, 566 (2d Cir. 2011) (holding that "[w]hen a choice-of-law clause is disregarded, courts engage in

traditional conflict-of-law analysis, the first step of which is to determine 'whether there is an actual conflict of laws on the issues presented'").

Efron recognizes that had the arbitrators performed this analysis and incorrectly applied the law, he would have no remedy as the parties submitted this issue to the panel for resolution. However, just like the interpretation of the indemnification language, there is no evidence that the arbitrators performed either the contractual or the traditional choice-of-law analysis. The failure to identify the choice-of-law question as an issue the arbitrators resolved in the Award, as required by FINRA Rule 12904(e), requires a finding that the arbitrators failed to resolve that issue and therefore committed misconduct and exceeded their authority. By ignoring their responsibility to make this threshold determination, they "effectively dispense[d] their own brand of industrial justice," which requires that the Award be vacated under § 10(a)(4). *Stolt-Nielson S.A.*, 559 U.S. at 663.

### B. Efron is prejudiced by the arbitrators' failure to perform the choice-of-law analysis and resolve which law to apply to the enforceability of the indemnification provision

Efron is prejudiced by the failure of the arbitrators to resolve the choice-of-law conflict because the choice-of-law was outcome determinative. Under Puerto Rico law the language in the indemnification clause was insufficient to require Efron to indemnify UBS for UBS's negligence as a matter of law.

**Under Puerto Rico law**, broad indemnification and exculpatory clauses are not favored, strictly construed against the drafter, and generally must **explicitly state that the contract is intended to shift liability from one party's negligence or wrongdoing to the other party in order to be valid**. *Waco Export Company, Inc. v. Expreso Meteoro, Inc*., 108 D.P.R. 309, 8 P.R. Offic. Trans. 317 (P.R. S.Ct 1979); *Chico v. Editorial Ponce, Inc*., 101 D.P.R. 759, 1 P.R. Offic. Trans. 1036 (P.R. S.Ct. 1973).   In fact, Puerto Rico has concluded that clauses that do not explicitly exculpate a party for its own negligence in contracts entered into with unequal bargaining power, are "contrary to the public interest, and **have no value whatsoever**." *Chico*, 1 P.R. Offic. Trans. at 1059. (emphasis added).

In *Chico*, the Supreme Court of Puerto Rico noted that exculpatory clauses are not encouraged in Puerto Rico and that it had previously "rejected the contractual clauses directed to exculpate a priori one of the parties to a contract for the damages subsequently caused to the other contracting party for negligent acts of the first." *Id*. (citing *Carrasquillo v. Am. Missionary Association*, 61 P.R.R. 837 (1943); *Cabrera v. Doval*, 76 P.R.R. 728 (1954*); Rivera v. San Juan Racing*, *1058 90 P.R.R. 405 (1964); *Castro v. Supermercado de Descuentos*, 99 P.R.R. 826 (1971)).

The *Chico* court additionally noted that, although its Civil Code acknowledges the liberty of contract, the Code also "sets forth that the will of the contracting parties shall not be at variance with the laws, the morals, or the public order," and that "31

41

L.P.R.A. § 4, provides that the rights granted by the laws may be waived, provided that said waiver is not contrary to law, to the public interest, or the public order, or prejudicial to the interests of a third party." *Id*. Thus, the Supreme Court of Puerto Rico held that "[t]he waiver of rights set forth by art. 4 of the Code shall be clear, conclusive, and unequivocal. Even more so when dealing with agreements exculpating a person from liability for its future negligent acts." *Id*.

One of the factors the court found especially important when determining the validity of an exculpatory clause was the bargaining power of the contracting parties, and concluded that **"[i]f they are not on the same footing and power, so that a party is under the obligation to accept the exculpation from liability for negligence of the other party, the clause is null**." *Id*. at 1059 (citing *Delta Airlines, Inc. v. Douglas Aircraft Company*, 47 Cal. Rptr. 518 (1966)); *Henningsen v. Bloomfield Motors, Inc*., 161 A.2d 69 (1960); *Donna v. Con Edison*, 337 N.Y.S.2d 722 (1972); *Kansas City Power & Light Co. v. United Tel. Co. of Kan*., 458 F.2d 177 (1972)). After applying these principles in *Chico*, the Supreme Court of Puerto Rico found that "the conclusion is inevitable: that exculpatory clauses like the one involved herein are contrary to the public interest, and therefore, have no value whatsoever." *Id*. at 1059.

Puerto Rico courts have even refused to enforce explicit indemnification clauses as contrary to public policy. For example, in *Waco*, the Supreme Court of

Puerto Rico found that a clause included in a commercial contract between a shipper and carrier relieving the carrier from liability due to its own negligence was "null and ineffective since [it is] at variance with the public interest embodied in the Commercial Code." *Waco Export Co.*, 8 P.R. Offic. Trans. at 323. **Even though Waco allegedly "agreed to assume all transportation risks, it could not be released from liability [] for its negligence because such agreement for total release would contravene the public order and the Commerce Code."** *Id.* at 321 (emphasis added). As the court recognized, to find otherwise would simply encourage irresponsibility, which would be at variance with the public interest embodied in the Commercial Code. *Id.* at 322-23. *See also Samer Serv. Station Corp. v. Gasolinera Shell Fairview*, 2017 P.R. App. LEXIS 2524, *10-12 (2017) (rejecting as a matter of public policy contractual indemnification provisions seeking to exonerate one party from its own negligence as they promote acting with impunity in reliance of the contractual protection); *Cabrera*, 76 D.P.R. at 780-781.

In the instant case, the boilerplate indemnification clause buried in the MAA did not explicitly state that Efron was agreeing to indemnify UBS for the damages UBS might cause based on UBS's own negligence. Also, it was undisputed that UBS and Efron did not enjoy equal bargaining power. As UBS admitted during the final arbitration hearing, the MAA was a "take it or leave it" agreement, it was not negotiated or negotiable by the parties [ECF 45-1 at 28], and it was drafted by UBS.

43

[ECF 45-1. at 31]. Efron was required to sign the MAA as written if he wanted to open an account with UBS. Thus, the indemnification clause in the MAA was null and void and unenforceable under Puerto Rico law, Efron was prejudiced by the panel's failure to interpret and apply the applicable law, and the District Court erred by concluding that it did not need to consider the merits of Efron's claims under Puerto Rico law to determine prejudice. [ECF 70 at 3, note 1].

VII. **The Unreasoned Award Cannot Reasonably be Interpreted as Being Based on UBS's Equitable Claims**

First, although the District Court did not address UBS's equitable claim of unjust enrichment, that claim suffers from the same infirmities as its contract claim. The arbitrators' failure to indicate in the Award that they resolved UBS's equitable claim violates FINRA Rule 12904(e), constituting misconduct and rendering the Award fatally ambiguous and indefinite, resulting in the denial of due process and a fair hearing. Second, because there was a contract governing the dispute, the equitable claim of unjust enrichment is not available under either Puerto Rico or New York law. *See Puerto Rico Tel. Co. v. SprintCom, Inc.*, 662 F.3d 74, 97 (1st Cir. 2011) (holding that "it is well-settled under Puerto Rico law that the unjust enrichment doctrine is not applicable where…there is a contract that governs the dispute at issue"); *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F.Supp.2d 275, 311 (1998) ("Because both the sales of securities to the Funds and the liquidation of those securities were done pursuant to contracts…the unjust

enrichment claim may not lie.") (citations omitted); *Jose Garriga, Hijo, Inc. v. Condominio Marbella del Caribe Oeste y Otros*, 143 D.P.R. 927, 934 (1997) (explaining that where there is a contract, unjust enrichment is inapplicable). In the instant case there existed at least two contracts between UBS and Efron related to his investment accounts (the MAA and the Line of Credit Agreement). Thus, the arbitrators could not have lawfully issued the Award on UBS's unjust enrichment or equitable contribution claims.

The arbitrators also could not have issued the Award on UBS's equitable claim because a necessary element under both New York and Puerto Rico law, is that Efron benefited from UBS's settlement payment to Candelario. *Nasca v. Greene*, 216 A.D. 3d 648, 650 (N.Y. S.Ct. App. 2023) ("The elements of a cause of action to recover for unjust enrichment are (1) the defendant was enriched, (2) at the plaintiff's expense, and (3) that it is against equity and good conscience to permit the defendant to retain what is sought to be recovered.") (citation omitted); *Mun. de Quebradillas v. Corp Salud Lares,* 180 D.P.R. 108, at __ (2011) (same).

The undisputed evidence is that Efron received no benefit or credit for UBS's payment to Candelario. Efron actually sought credit for that payment [ECF 57-1 at 9], but the **court ruled that the settlement payment UBS paid Candelario was payment for UBS's negligence, not to resolve Efron's monetary obligations to**

**Candelario, which remains a collectable judgment against Efron**. Efron filed a certiorari petition objecting to that ruling, but his petition was denied. *Id*.

UBS's argument that Efron was somehow unjustly enriched because he was able to withdraw funds from his UBS accounts is equally unavailing because it is black letter law that one who seeks equity must do equity and he must come to the court with clean hands, which UBS clearly did not do since it was its own negligence that caused its damages. The "clean hands" doctrine is "one of the fundamental principles upon which equity jurisprudence is founded." *Keystone Driller Co. v. General Excavator Co*., 290 U.S. 240, 244 (1933) (quoting STORY'S EQUITY JURISPRUDENCE (14th ed.) § 98)). If a person has unclean hands with respect to the matter in litigation, "'whatever may be the rights he possesses, and whatever use he may make of them in a court of law, he will be held remediless in a court of equity.'" *Id*. (quoting *Deweese v. Reinhard*, 165 U.S. 386, 390 (1897)).

Unjust enrichment was clearly not available to UBS. There existed a contractual relationship between UBS and Efron, thus precluding equitable relief and UBS's hands were "unclean." It provided Efron's confidential financial information to Candelario, did not inform Efron about the breach of its fiduciary duty to Efron, violated a court order and released the restraints on Efron's accounts which enabled it to pay itself and its affiliate nearly $8 million dollars rather than protecting the money for collection by Candelario, lied to Efron to cover up its

negligence, and spent eight years in litigation before admitting its negligence which caused the damages it seeks to recover from Efron, its customer. *See Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,* 324 U.S. 806, 814 (1945) (holding that "[t]his maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant"); *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 480 (2009) (applying Puerto Rico law stating "Our courts have long held the view that "[h]e who comes into equity must come with clean hands.") (citing *Dr. Jose S. Belaval, Inc. v. Perez-Perdomo*, 488, F.3d 11, 15 (2007) (applying Puerto Rico law)); *Texaco Puerto Rico, Inc. v. Department of Consumer Affairs*, 60 F.3d 867, 880 (1995) ("It is old hat that a court called upon to do equity should always consider whether the petitioning party has acted in bad faith or with unclean hands.").

In addition to UBS's equitable claims being barred by its unclean hands, the ones who were enriched from UBS's negligence were Candelario, UBS and UBS's affiliate, UBS Bank USA. Candelario was paid $4.5 million, and UBS and its affiliate were paid approximately $8 million. Efron did not run off with the money as UBS represents in its Motion to Confirm. The one who made off with the money was UBS and its affiliate. I**t paid itself $177,578** for the unpaid interest that it was

unable to collect while the accounts were frozen [ECF 45-1 at 106], UBS and UBS Bank USA were paid **approximately $8 million** from Efron's accounts [ECF 45-1 at 78-79], and UBS obtained a credit of over $1 million towards the amount it agreed to pay Candelario based on moneys Efron paid Candelario and she was able to seize from another bank, *Del Moral v. UBS Financial Services Incorporated of Puerto Rico*, 2016 WL 1275038 at *24 (D.P.R. April 6, 2016), [ECF 44-1 at 110], and the courts have refused to reduce Efron's monetary obligations to Candelario by the money paid by UBS.

## VIII. <u>The District Court Erred by Concluding that the Award Was Not the Product of UBS's Misconduct</u>

The District Court factually erred by concluding that there was no evidence that the Award was procured by misconduct, undue means, or a biased and prejudiced panel. [ECF 70 at 6-7]. UBS's misconduct dominated and permeated the arbitration, biased and prejudiced the arbitrators against Efron, and induced the misconduct of the panel. The record reflects that instead of cleanly trying this contract interpretation case, UBS focused its attack on Efron even after admitting that there was nothing Efron said or did that influenced its decision to commit the misconduct that resulted in the damages against UBS it seeks to recover from Efron. [ECF 45-1 at 108-09, 159-60]. From the beginning of its presentations, even after advising the arbitrators that this was a straightforward contract case, UBS began attacking Efron: "But Mr. Efron has spent the last 21 years making claims against

him appear far from straightforward (improperly referring to Efron's litigation with his ex-wife where he has successfully defended against her false claims against his non-marital assets). He has delayed claims; he has tried to deflect responsibility of claims against him; he has tried to create smokescreens." [ECF 44-1 at 21].

In both its Prehearing Brief [ECF 56-1 at 9-12] and at the arbitration Final Hearing, UBS introduced evidence and argument, over repeated objections by Efron's counsel, regarding: (1) what transpired in the prior arbitration, which was reversed due to misconduct by the arbitrators induced by UBS; (2) findings by the circuit court that were reversed on appeal; (3) the dispute in the circuit court over the Scheduling Order, which was never resolved; (4) the selection of the arbitrators; and (5) other unrelated matters. None of these matters were in any way relevant because UBS admitted it was its negligence and its negligence alone that caused its damages, and all of these matters were highly prejudicial. The only matters properly before the panel to arbitrate were the interpretation and enforceability of the indemnification clause in the MAA.

The inflammatory evidence was clearly introduced to taint and prejudice the panel, which apparently succeeded. The record reflects eighty pages of transcript devoted exclusively to introduction of the prior proceedings, just in the first day of the Final Hearing [ECF 44-1 at 161-238]; thirty pages of transcript on the third day addressing what occurred in the first arbitration which was reversed due to the UBS-

induced misconduct by the arbitrators and UBS's attempt to litigate the unresolved Scheduling Order issue in the trial court [ECF 46-1 at 223-252]; 13 pages of transcript on the fourth day introducing completely irrelevant hearsay evidence from other court proceedings unrelated to the UBS litigation with Candelario or with Efron [ECF 47-1 at 112-125]; and, of course, in UBS's closing arguments it used these unrelated matters to again attack Efron. [ECF 48-1 at 152-154, 165-168].

UBS's improper tactics were meant, and did in fact, prejudice the panel against Efron and denied him of his right to a fair hearing. Efron's arbitration counsel recognized what UBS was doing, repeatedly objected, and warned the arbitrators: "I think [UBS] [is] attempting to affect the panel's decision in this arbitration proceeding….This panel should have a clean, fair look at the evidence and decide on their own." [ECF 44-1 at 161-62]. "We object again, to this whole line of hearing – testimony. We believe it is tainting – this panel….So we have an objection to all of this….You're a new panel and you come in with a clean slate here, but what Mr. Manning is doing – it's just unacceptable." [ECF 44-1 at 183].

**UBS even introduced documents from prior proceedings that had been restricted from the panel's access because they were not relevant and so they would not influence the new panel.** [ECF 44 -1 at 185.].

> MR. FERNANDEZ: I have the same objection. There is a reason why the new panel does not have access to those documents. He's intending to present documents related to the previous hearing, and ones filed before the previous hearing that was vacated. He's going

-- he's trying to bypass the FINRA portal and the access that you have had -- that's why I asked, What documents do you have access to? I have a reason for that -- so you have a clean slate here. He's trying to taint the whole process by presenting before you, documents related and presented before another panel that was set aside. So I am warning everybody, this is very dangerous for this proceeding.

UBS ignored its contract interpretation case, and instead directed the panel to try Efron's character. It introduced documents, court rulings and decisions from totally unrelated cases, attacked Efron's character [46-1 at 223-252; 47-1 at 112-125; 48-1 at 152-154, 165-168], and went so far as to suggest that the ruling from the Third District reversing the first arbitration was incorrect and was obtained because Efron's counsel was a prior Judge on the Third District. [ECF 44-1 at 199].

That UBS's misconduct induced the arbitrators' misconduct is indisputable. The arbitrators denied nearly every one of Efron's objections, allowed UBS to put Efron's character on trial, violated mandatory FINRA rules, and failed to perform the only tasks it had the authority to arbitrate. The Award (which does not identify interpretation or the enforceability of the indemnification provision in the MAA or the jurisdictional law to apply in the case) reflects that they ignored and failed to resolve those issues, thereby committing misconduct and exceeded the authority granted them.

## IX. **The Attorney's Fees Portion of the Award Must Also be Vacated**

The attorney's fees awarded must also be vacated for the reasons argued regarding the main claims. The indemnification clause in the MAA cannot be interpreted as requiring Efron, a customer, to indemnify a financial institution for the institution's own negligence, and UBS's equitable claims fail where the parties' relationship was governed by contract. Additionally, it was unrefuted that the invoices for UBS's counsel were addressed to and paid by UBS Investment Bank, a totally different entity from the claimant in this action. [ECF 48-1 at 136]. UBS cannot recover for fees paid by someone other than UBS. Only that entity may sue for relief and then seek contribution from UBS if the monies were paid for UBS's benefit.

## **CONCLUSION**

Efron respectfully requests that this Court reverse the District Court's Order [ECF 70] and Judgment [ECF 72] denying Efron's Motion to Vacate and granting UBS's Motion to Confirm the Award: (1) based on the misconduct of the arbitrators who failed to interpret the indemnification clause in the MAA and determine its enforceability under the applicable law under § 10(a)(3); (2) where the arbitrators "exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made" under § 10(a)(4); (3) where the Award was the product of UBS's willful misconduct employed to taint

the arbitrators and which prejudiced, biased the arbitrators and induced them to commit misconduct, exceed their authority, and violate their duties under § 10(a)(1)-(4).

Dated: February 20, 2024          Respectfully submitted,

                                   /s/ Leslie B. Rothenberg
                                   Leslie B. Rothenberg, Esq.
                                   FBN: 607850
                                   THE FERRARO LAW FIRM, P.A.
                                   600 Brickell Avenue, 38th Floor
                                   Miami, Florida 33131
                                   305-375-0111
                                   lrothenberg@ferrarolaw.com
                                   mgutierrez@ferrarolaw.com
                                   sscott@ferrarolaw.com


## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2023, David Efron's Initial Brief was electronically filed with the Clerk of Court using CM/ECF, which will provide notice to all counsel of record.

                                   By: /s/ Leslie B. Rothenberg
                                   Leslie B. Rothenberg, Esq.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

**Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements**

1. This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because this brief contains 12,939 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word's 14-point Times New Roman type.

Dated: February 20, 2024        THE FERRARO LAW FIRM

By: */s/ Leslie B. Rothenberg*
     Leslie B. Rothenberg, Esq.
     *Counsel for Appellant, David Efron*